UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANDACE F. CUISINIER,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br><br>　　　　Defendant. | Case No. 16-cv-00585-MEJ<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 17, 20 |

## INTRODUCTION

Plaintiff Candace Cuisinier ("Plaintiff") brings this action on behalf of her minor child CWW ("Claimant" or "CWW") pursuant to 42 U.S.C. § 405(g). Plaintiff seeks judicial review of a final decision of Defendant Carolyn W. Colvin ("Defendant"), the Acting Commissioner of Social Security, denying Claimant's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Pl.'s Mot., Dkt. No. 17; Def.'s Cross-Mot., Dkt. No. 20. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and the relevant legal authority, the Court hereby **GRANTS IN PART** Plaintiff's Motion and **DENIES** Defendant's Cross-Motion for the reasons set forth below.

## BACKGROUND

CWW was born in February 2008. AR 125. Dr. Fernandez, a psychiatrist, diagnosed CWW with Attention Deficit Hyperactivity Disorder ("ADHD") in January 2012. AR 405. He prescribed ADHD medication at the time of diagnosis. AR 322. CWW also attended therapy sessions with Dr. Fernandez, who repeatedly observed her to be hyperactive, have limited attention/concentration, and have limited impulse control. AR 353 (May 2012), 326 (June 2012),

368 (June 2012), 336 (July 2012: "very busy but engaging and re-directable, responds to limits; eager to please"), 346-7 (July 2012: "squirmy, was not able to stay in chair, cooperative, polite, respectful, aloof but pleasant"), 509-10 (October 2012: CWW "very busy but engaging and re-directable, responds to limits; eager to please"; Dr. Fernandez also observed that while Plaintiff says she continues to medicate CWW and needs refill now, she "should have ran out 3 weeks ago.").

Six months after her initial diagnosis of ADHD, Dr. Fernandez also diagnosed CWW with Disruptive Disorder. AR 328. While CWW showed some improvement in behavior with medication, she repeatedly disrupted her preschool class in 2012; the school disciplined CWW multiple times for being violent, defiant, mean, and disruptive. *See* AR 353 (Plaintiff reported to Dr. Fernandez in May 2012 that CWW's behavior was sufficiently severe that her preschool threatened to expel her), 170-72 (kindergarten teacher notes detailing disciplinary actions against CWW for behavior occurring between 9/18/2012 and 10/16/2012). Dr. Fernandez added medication in October 2012, after Plaintiff and CWW's teachers reported that CWW continued to act out in class. AR 516. When Dr. Fernandez increased CWW's does of Intuviv in November 2012, CWW's symptoms finally improved. AR 545 ("3mg of intuniv is actually helping calm [CWW] down. [CWW] was able to sit in chair today, her speech was a lot clearer and made more sense. . . Mom says she is pleased with current dose."); *see also* AR 550 (in January 2013, "Mom reports [CWW's] medications working very well at home and at school. [CWW] reportedly getting good feedback from teacher. Mom says at home [CWW] is sleeping well and on time, calmer and more cooperative. Mom says [CWW] took medications throughout most of the holidays because it was needed. . . . calm, cooperative, pleasant; improved attention and concentration.").

CWW's teacher completed a questionnaire for the Social Security Administration ("SSA") in February 2013. AR 559-566. The questionnaire required the teacher to assess CWW's performance in a number of areas. The teacher indicated CWW had "no problem" in the area of "Acquiring and Using Information," but noted that the scores given are based on CWW being on

2

medication, "without [it] she is very active." AR 560. The teacher noted CWW either had "no problem" or "a slight problem" on a weekly basis in "Attending and Completing Tasks." AR 561. The teacher noted: "CW[W] does not need extra help, however when she is not taking medication, she laughs at you when asked to refocus on a task, and does not follow through." *Id*. The teacher's scores and comments were similar for CWW's ability to "Interact[] and Relat[e] With Others," except the teacher noted CWW had an "obvious problem" with "Respecting/obeying Adults in Authority" on a weekly basis. AR 562. Although the teacher indicated CWW had no or a slight problem in "Caring for Herself," she wrote that "without medication I would have scored her a 5 [very serious problem] in 7, 8 & 9 [Identifying and Appropriately Asserting Emotional Needs; Responding Appropriately to Changes in Own Mood; Using Appropriate Coping Skills to Meet Daily Demands of School Environment.] Before medication her behavior demonstrated a serious problem in these areas. She had emotional and verbal outburst frequently. . . ." AR 564. In conclusion, CWW's teacher wrote: "The medication has allowed [CWW] to participate in class, and control her emotions and moods." AR 565.

CWW's progress has not been linear. Her kindergarten teachers indicated CWW's behavior was "poor" several weeks in April-May 2013, and "extremely poor" one week in April 2013. AR 590-95. On three occasions, CWW told her teachers that her mother did not give her her medication. AR 594-95. Plaintiff reported to Dr. Fernandez in April 2013 that the school had threatened to expel CWW for her extremely poor behavior. AR 610. In July 2013, Dr. Fernandez reported Plaintiff had no concerns regarding CWW, that CWW was "doing better on meds (needs to be on meds)" and that CWW was "cooperative, good eye contact." AR 608. He also noted in November 2013 that CWW's "symptoms [were] controlled by meds. . . [CWW's] symptoms controlled for school academic." AR 606. He observed CWW was "cooperative, fidgety even with [C]oncerta today, (end of day)." *Id*. After a family trip to Florida, where CWW "was acting out," Plaintiff requested CWW "temporarily restart [A]bilify [another medication] to help with transition back to school routine." AR 617. Dr. Fernandez observed CWW was cooperative and had good eye contact, but appeared anxious and fidgety, and she could not sit still. AR 634.

3

Dr. Fernandez completed an ADHD form questionnaire regarding CWW's impairment in November 2013. AR 584-587. CWW's counsel provided the questionnaire to Dr. Fernandez for purposes of the SSA proceedings. *Id.* Dr. Fernandez found CWW had marked impairments in age-appropriate cognitive/communicative and personal functions; and deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner. AR 585-86.

In January 2014, CWW's teacher wrote that CWW "tends to get into mischief and has a short attention span. Although she is under medication, [CWW] still has a hard time listening and staying focused." AR 625. A report card from January 2014 (the first trimester of the 2013/2014 school year) shows CWW meets grade level standards in all subjects except for counting and cardinality, for which she only partially meets grade level. AR 203 (Exhibit 12/E). It further shows CWW performed as expected in organizational skills/work habits and citizenship/conduct, and received marks of "outstanding performance" in several areas, such as listening attentively and following directions; returning completed homework on time; demonstrating effort in academic work; self-control; and respect for authority. AR 204.

In March 2014, Plaintiff reported to Dr. Fernandez that CWW had a "rough month" at school: CWW's teachers found her very disruptive, and Plaintiff had to pick CWW up from school 7-10 times for sedation or defiance. AR 627; *see also* AR 226-28 (multiple discipline referral forms from school for March 2014). Dr. Fernandez observed CWW's mood was irritable. *Id.* Between January and April 2014, CWW's school nurse wrote notes to Dr. Fernandez on six occasions reporting CWW was drowsy or unable to stay awake at school. AR 223-25; *see also* AR 218-22 (multiple discipline referral forms from school for May 2014).

Plaintiff requested bloodwork be performed for CWW in March 2014. She was concerned about the impact of CWW's ADHD medication on her kidneys. *See* AR 634 (Plaintiff "[w]ants patient to get labs done due to recurrent daytime somnolence and 'manic episodes' at home. States patient always falling asleep in class. Had issues with insomnia but that's resolved. Sleeps for about 9 hours every night.").

4

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On April 11, 2012, Plaintiff filed an application for children's disability benefits under the Supplemental Security Income ("SSI") Program for CWW. AR 128. Plaintiff alleged Claimant's disability began at her birth on February 11, 2008. AR 13. On September 14, 2012, the SSA denied Plaintiff's claim, finding that CWW did not qualify for disability benefits. AR 69. Plaintiff subsequently filed a request for reconsideration, which was denied on April 12, 2013. AR 73, 78. On May 3, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 88. ALJ Brenton Rogozen conducted a hearing on January 12, 2014. AR 42-66. Plaintiff testified about CWW's condition in person at the hearing, and was represented by counsel. *Id*. The ALJ also heard testimony from an impartial medical expert, Dr. Rasmussen. *Id*.

### A.     Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified her daughter was disruptive at home even when she took medication. AR 53. She testified that CWW constantly talked, stayed up late, and woke up in the night; she cursed; pulled children's hair and choked other children; performed sexual acts with dolls; smeared feces on the walls of the bathroom; and was "out of control." AR 48, 61-62, 64. CWW's older brother complained his sister talked too much, hit him, and woke him up in the middle of the night. AR 48.

### B.     Dr. Rasmussen's Testimony

Dr. Rasmussen testified CWW had medically determinable impairments of ADHD with hyperactivity, disruptive or mood disorder; a mild speech delay, and a sleep disorder labeled as insomnia. AR 51-52. He testified it was "possible to make a claim for functional equivalency [to a Listing[1]] when you add up the ADHD, depending on how bad the insomnia is and the mood disorder." AR 53; *see also* AR 54 (based on Plaintiff's testimony regarding CWW's conduct while she is medicated, Dr. Rasmussen opined "it sounds to me, with what mom's saying, that

---

[1] The SSA Childhood Listing of Impairments describes, for each major body system, impairments considered severe enough to cause marked and severe functional limitations for children under 18 applying for SSI. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

5

probably would be documentable. I don't know. But I think we could make a case of functional equivalence because of how she's functioning.").

The ALJ asked Dr. Rasmussen whether CWW had marked limitations in the six "domains" the SSA uses to establish functional equivalence to a listed impairment: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical wellbeing. Relying heavily on CWW's Fall 2013 kindergarten report card, Dr. Rasmussen found CWW had marked limitations in "interacting with others," but found she had less than marked limitations in the other five domains, including "attending and completing tasks." AR 55-56 (citing Exhibit 12/E). He observed there was a "contrast" between the school report card and Plaintiff's testimony. AR 55.

Plaintiff's counsel then asked Dr. Rasmussen to assess whether CWW met the criteria for the childhood listing of ADHD. AR 59-60. Dr. Rasmussen found CWW did not have marked inattention, "especially when she's on her medicine"; did not have marked impulsiveness "when she's on her medication, at least at school," and "same thing for . . . marked hyperactivity." AR 59. Dr. Rasmussen testified: "I don't think she quite makes a clear-cut case for one of those listings alone. But she's close enough, at least on one of them, with the spirit of functional equivalence and the other problems she's got, I think it would be, in the spirit of getting the truth of this, I think she probably does make it with functional equivalence." AR 59.

C. **The ALJ's Findings**

SSI is available for an individual under the age of 18 who is "disabled." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also id*. § 1381a. A child is "disabled" if she "has a medically determinable physical or mental impairment, which results in marked and severe limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. § 1382c(a)(3)(C)(i); *Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir. 2000). "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995) (citing *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir.

1992), *cert. denied*, 517 U.S. 1122 (1996)).

The Commissioner has established a three-step sequential evaluation process for the ALJ to follow when considering the disability application of a minor claimant. *See* 20 C.F.R. § 416.924. At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity." *Id*. § 416.924(a). If the claimant engages in substantial gainful activity, she is not disabled regardless of his medical condition, age, education, or work experience. *Id*. § 416.924(a)-(b). Here, CWW was four years old when she applied for disability benefits; the ALJ accordingly determined that she had not engaged in substantial gainful activity since the application date. AR 16.

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ must determine whether the claimant has a "severe" medically determinable impairment or combination of impairments. 20 C.F.R. § 416.924(a). For a child, a medically determinable impairment or combination of impairments is not severe if it is a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. . . ." *Id*. § 416.924(c). If the claimant's impairment(s) is not severe, the child is not disabled, and SSI is denied at this step. *Id*. § 416.924(a), (c). The ALJ determined the Claimant had the severe impairment of ADHD. AR 17. The ALJ also determined CWW had a number of conditions that were not severe impairments: growth impairment; endocrine impairment; hearing loss; and speech and language impairments. AR 16. The ALJ did not address CWW's sleep disorder. *Id*.

If the ALJ determines that one or more impairments are severe, at step three, the ALJ must determine whether the claimant's impairment(s) meets, medically equals, or functionally equals an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing"). 20 C.F.R. § 416.924(a), (d); 20 C.F.R. § 416.925. The mere diagnosis of an impairment in the Listing is insufficient to sustain a finding of disability. *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985). The impairment must also satisfy all of the criteria of the Listing. 20 C.F.R. § 416.925(d). If the claimant's impairment(s) meets or equals a Listing impairment, and meets the durational

7

requirement, disability is presumed and benefits are awarded. *Id*. § 416.924(a), (d). Here, the ALJ observed that no physician had opined that CWW's condition met or equaled a Listing; the state agency program physicians opined that CWW's condition did not meet or equal a listing; and Dr. Rasmussen opined CWW's condition did not meet or medically equal a listing. AR 17. The ALJ opined that CWW had less than marked limitations in inattentiveness and hyperactivity when she takes her medication and therefore "she does not meet the listing" for ADHD. *Id*.

If the claimant does not meet or medically equal a Listing, she may still be considered disabled if an impairment results in limitations that "functionally equal the listings." *Id*. § 416.924(a), (d); *id*. § 416.926a(a). In determining whether the severe impairment(s) functionally equals the Listings, the ALJ must assess the claimant's functioning in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical wellbeing. *Id*. § 416.926a(b)(1). To "functionally equal" the Listings, the impairment(s) must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id*. § 416.926a(a), (d). In this assessment, the ALJ must look at "how appropriately, effectively, and independently [claimant] preform[s] [his] activities compared to the performance of other children [claimant's] age who do not have impairments." *Id*. § 416.926a(b).

A child has a "marked" limitation in a domain when her impairment(s) "interferes seriously" with her "ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i). The regulations also provide that "marked" limitations means a limitation that is "more than moderate" but "less than extreme." *Id*. A child has an "extreme" limitation in a domain when her impairment(s) "interferes very seriously" with her "ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(3)(i). The regulations also provide that an "extreme" limitation also means a limitation that is "more than marked." *Id*. However, "extreme" limitation does not mean a "total lack or loss of ability to function." *Id*.

The ALJ found that CWW had less than marked limitation in acquiring and using information; interacting and relating with others; moving about and manipulating objects; caring

1  for herself; and health and physical well-being. AR 23-29. The ALJ also found CWW had less
2  than marked limitations in attending and completing tasks. AR 25-26. Specifically, the ALJ
3  concluded: "Records show that when the claimant takes appropriate medication, she is able to
4  concentrate sufficiently, complete tasks, and sit in her chair (albeit while squirming); as
5  demonstrated by her kindergarten report card, her pre-kindergarten teacher's questionnaire, and
6  her treating psychiatry records." AR 26.

7  The ALJ rendered this decision on April 8, 2014. AR 10. This decision became final
8  when the Appeals Council declined to review it on December 3, 2015. AR 1. Having exhausted
9  all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42
10  U.S.C. § 405(g). On July 28, 2016, Plaintiff filed the present Motion for Summary Judgment
11  ("Motion"). On September 30, 2016, Defendant filed a Cross-Motion for Summary Judgment
12  ("Cross Motion").

## LEGAL STANDARD

14  The Court has jurisdiction to review final decisions of the Commissioner pursuant to 42
15  U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by
16  substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*,
17  246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a
18  scintilla but less than a preponderance" of evidence that "a reasonable person might accept as
19  adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002)
20  (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The
21  court must consider the administrative record as a whole, weighing the evidence that both supports
22  and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).
23  However, "where the evidence is susceptible to more than one rational interpretation," the court
24  must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).
25  Determinations of credibility, resolution of conflicts in medical testimony, and all other
26  ambiguities are to be resolved by the ALJ. *Id.*

27  Additionally, the harmless error rule applies where substantial evidence otherwise supports

9

the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990). A court may not reverse an ALJ's decision on account of an error that is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

**DISCUSSION**

Plaintiff argues four errors warrant reversal of the ALJ's decision. Defendant contends the ALJ did not err, and asks the Court to affirm the decision. The Court addresses each of Plaintiff's arguments in turn.

**A.    Limitations in Attending to and Completing Tasks**

Plaintiff argues the ALJ erred in finding that Claimant had less than marked limitations in her ability to attend or complete tasks, which is one of the domains the ALJ evaluated to determine whether CWW's ADHD functionally equaled a Listing. *See* Mot. at 9. The ALJ found the "[r]ecords show that when the claimant takes appropriate medication, she is able to concentrate sufficiently, complete tasks, and sit in her chair (albeit while squirming); as demonstrated by her kindergarten report card, her pre-kindergarten teacher's questionnaire, and her treating psychiatry records." AR 25-26.

Plaintiff contends the record as a whole supports a finding of marked limitations in this domain. Mot. at 9-11. She points out that on numerous occasions, CWW's teachers and treating physicians have observed her being hyperactive, unable to sit still, having limited attention or impulse control, being distracting to others, failing to follow directions, and being unable to focus. *Id.* at 10 (citing AR 171-2, 218-22, 226, 228, 285, 326, 328, 368, 373, 393, and 423). CWW's treating psychiatrist noted limited attention and impulse control on most visits, and indicated on an evaluation form that CWW had "marked inattention" and "marked difficulties with concentration." *Id.* (citing AR 226, 228, 285, 326, 328, 368, 373, 393, 423, 585-6). CWW's teachers describe her as having "extreme instances of distraction and failure to pay attention.").

10

*Id.* (citing AR 171-2, 218-22, 492, 590, 594-5, and 625).

Defendant responds the ALJ properly relied on the testimony of Dr. Rasmussen who opined, based on CWW's report card from Fall 2013, that CWW's limitations were less than marked. Cross-Mot. at 3-4. Dr. Rasmussen observed there was "contrast" between the report card and Plaintiff's testimony, but ultimately relied on the report card. Dr. Rasmussen's opinion is consistent with other evidence in the record, not just the Fall 2013 report card, but the February 2013 kindergarten questionnaire, and Plaintiff's own reports that CWW was manageable when she was taking her medication. As such, his opinion may serve as substantial evidence in the SSA proceedings. *See Morgan v. Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999).

While other evidence in the record also supports Plaintiff's testimony that CWW continued to act out and be "out of control" both at school and at home, this Court may not substitute its judgment for that of the ALJ when the ALJ's judgment is supported by substantial evidence in the record. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**B.   Rejection of Medical Sources**

Plaintiff contends the ALJ erred in rejecting the opinion of CWW's treating psychiatrist, Dr. Fernandez, and in rejecting portions of Dr. Rasumssen's testimony. Mot. at 11-13.

1.   <u>Dr. Fernandez</u>

Dr. Fernandez began treating CWW in January 2012. He filled out a form questionnaire in November 8, 2013, indicating CWW had marked impulsivity, inattention and hyperactivity, marked impairments in age-appropriate cognitive or communicative functioning, personal functioning, and in deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner. AR 585-86. The ALJ did not give any weight to Dr. Fernandez' assessment of CWW's limitations because he found that in completing a "fill-in-the blank form, prepared with the claimant's disability application in mind," Dr. Fernandez was "acting as an advocate, instead of providing an objective functional assessment." AR 22. The ALJ further found Dr. Fernandez's opinion conflicted with the evidence in the record documenting

11

less severe limitations. AR 22. Finally, the ALJ observed that Dr. Fernandez's own records established CWW responded to medication. AR 23. Thus, the ALJ concluded the objective evidence in the record did not support the level of severity Dr. Fernandez documented on the form, and the ALJ gave Dr. Fernandez's opinion neither controlling nor substantial weight. AR 23.

An ALJ must give controlling weight to the opinion of a treating physician if it is (1) well-supported and (2) not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2). If an ALJ does not give controlling weight to the opinion of a treating physician, she must "give good reasons" for failing that decision. *Id*. Where the opinion of a treating physician is un-contradicted, courts in the Ninth Circuit review an ALJ's decision to reject the opinion, under a "clear and convincing" reasons standard. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010).

The form asked Dr. Fernandez to check off items, and listed the formal SSA requirements for each item. Dr. Fernandez did not, however, provide the basis for the ultimate conclusions he indicates by checking off the form. The ALJ noted Dr. Fernandez "failed to cite any medical testing results or objective observations to support his conclusions as to [CWW's] residual functional capacity." AR 22. The ALJ may reject such "check the box" forms. *See Molina*, 674 F.3d at 1111-12 (ALJ permissibly rejected "check-the-box form" that does not provide supporting reasoning or clinical findings "despite being instructed" to provide such findings); *see also Thomas*, 278 F.3d at 957 ("[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."). The ALJ further observed Dr. Fernandez's opinion was inconsistent with other substantial evidence in the record, to wit his own treatment records showing CWW responded to medication. AR 22.

But at best, the evidence in the record that CWW consistently responded to medication was ambiguous. Dr. Fernandez's treating records showed that while CWW did respond to medication at various times, she repeatedly needed to change dosage or prescription, and nonetheless continued to have difficulties at home and in school even when medicated. The difficulties CWW

experienced at school were corroborated not only by Plaintiff, but by numerous disciplinary action forms and teacher's reports that described CWW's behavior. Indeed, Dr. Rasmussen observed that the documentation of CWW's behavior is "paradoxical" and that the Fall 2013 Report Card is "in contrast to some of the other exhibits and what [her] mom has just told us." AR 55. Fernandez treated CWW for years and was the only physician treating CWW for her ADHD. If the ALJ believed the Dr. Fernandez's opinion was inadequately supported, the ALJ should have requested additional evidence from the treating physician. An "ALJ should not be a mere umpire during disability proceedings, but must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006) (citation and quotation marks omitted); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (ALJ has "a duty to conduct an appropriate inquiry" if she believes she needs to know the basis of a treating physician's opinions in order to evaluate them); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate inquiry.'" (quoting *Smolen*, 80 F.3d at 1288)).

Rather than reject the opinion of CWW's long-term treating psychiatrist because it was conveyed in a check-the-box form, the ALJ should have, at the very least, submitted further questions to Dr. Fernandez. The Court accordingly finds the ALJ did not provide clear and convincing reasons for rejecting Dr. Fernandez's opinion.

2. <u>Dr. Rasmussen</u>

Plaintiff argues the ALJ erred by failing to evaluate those portions of Dr. Rasmussen's testimony that established CWW medically equaled a specific Listing. *See* Mot. at 12. At the hearing, Plaintiff's attorney asked Dr. Rasmussen whether CWW met or equaled the childhood listing for ADHD, Listing 112.11. AR 56 (Q: "So doctor, you said there's a possible argument for medically equaling? Is that medically equaling the ADHD listing?" A: "I think that would probably be the most logical.") After some discussion with the ALJ, Dr. Rasmussen evaluated whether CWW met Listing 112.11 and testified: "I don't think she quite makes a clear-cut case for one of those listings alone. But she's close enough, at least on one of them, with the spirit of

13

1    functional equivalence and the other problems she's got, I think it would be, in the spirit of getting
2    the truth of this, I think she probably makes it with functional equivalence."  AR 59.  If Dr.
3    Rasmussen was discussing medical equivalence of Listing 112.11, and misspoke when he said
4    "functional equivalence," his testimony that CWW medically equaled a listing nonetheless is "at
5    best ambiguous" (Opp'n at 10).  The ALJ reasonably could find that no doctor testified CWW
6    medically met or equaled the childhood listing for ADHD.

**C.    Plaintiff's Credibility**

Plaintiff argues the ALJ erred in rejecting Plaintiff's statements regarding the severity and persistence of CWW's symptoms based on his conclusion Plaintiff was not "entirely" credible.  *See* Mot. at 14.  The ALJ could discredit Plaintiff's testimony based on clear and convincing reasons that reflect a review of the record as a whole.  *Molina*, 674 F.3d at 1112.

The ALJ discounted Plaintiff's statements about the intensity, persistence, and limiting effects of CWW's symptoms for two reasons: (1) there was no evidence in the record confirming Plaintiff's April 2012 allegations that CWW did not usually control her bowels or bladder during the day, and that she had some learning problems; and (2) the record showed that medications controlled CWW's behavior.  AR 21-22.  The April 2012 allegations are taken from a "check the box" Function Report Plaintiff completed in connection with the SSI proceedings, where Plaintiff was asked to identify conditions CWW experienced at that time.  *See* AR 138-145.  The form provides no instructions and imposes no threshold requirements regarding the frequency or severity of the conditions.  Moreover, CWW was 4 years-old at the time.  The evidence the ALJ relied upon to find Plaintiff not credible was the February 2013 questionnaire CWW's teacher completed for the SSA (AR 559-566) when CWW was 5 years old, and CWW's January 2014 report card, when CWW was almost 6 years old.  The two pieces of evidence the ALJ relied upon thus describe CWW's conduct ten and twenty months after Plaintiff described her daughter's conduct.  These documents might allow the ALJ to make an adverse credibility finding if they pertained to an adult, but they pertain to a toddler.  The fact CWW could control her bladder and did not have learning problems in February 2013 or January 2014 does not even suggest Plaintiff

14

1  misrepresented the existence of these problems in April 2012.  With respect to medications
2  controlling CWW's behavior, the record is ambiguous.  Plaintiff was one of many witnesses who
3  complained of CWW's continued problematic behavior even while medicated, namely, her
4  teachers who continued to send disciplinary action forms and document CWW's disruptive
5  conduct at school.  Dr. Fernandez's records also show that Plaintiff brought CWW for medication
6  adjustments on several occasions complaining that the medications were not controlling CWW's
7  ADHD.

8  The Court finds the reasons articulated by the ALJ for discrediting Plaintiff's testimony
9  were not clear and convincing.

### D.  Sleep Disorder

Plaintiff argues the ALJ erred in finding that CWW's sleep disorder was not severe at Stage two of the disability analysis.  *See* Mot. at 15.  Stage two is a "de minimis" screening device to dispose of groundless claims" (*Smolen*, 80 F.3d at 1290); it is not intended to require an in depth inquiry into the severity of the impairment.  Only "a slight abnormality that has no more than a minimal effect on an individual's ability" (*Webb*, 433 F.3d at 686) should be considered as not severe at this stage of the ALJ's analysis.  Defendant argues the evidence of sleep disorder in the record is based either on Plaintiff's hearing testimony or on Plaintiff's statements to treatment providers.  Cross-Mot. at 14.  Defendant contends the ALJ could properly discount this evidence due to his adverse credibility finding for Plaintiff.  *Id*.  Defendant also argues Dr. Rasmussen did not testify that Plaintiff's sleep disorder was severe, but if he did, the error was harmless.  *Id*. at 14-15.  Defendant's arguments do not prevail.

The ALJ did not address the sleep disorder at Stage two of his analysis (AR 16-17), despite the fact Dr. Rasmussen testified unequivocally that CWW's sleep disorder constituted a medically determinable impairment (AR 51-52), and her teachers reported numerous incidents of CWW being drowsy or unable to stay awake at school (AR 223-25).  The Court already concluded the ALJ did not articulate clear and convincing reasons for discounting Plaintiff's credibility, . teachers' reports are not based on Plaintiff's reports, but on their own observation.  Moreover, the

15

The Court cannot find this error is harmless, given Dr. Rasmussen's equivocation regarding functional equivalence. *See* AR 53 ("[I]t's possible to make a claim for functional equivalency when you add up the ADHD, depending on how bad the insomnia is and the mood disorder."); *see also* AR 56 (finding CWW had "less than marked" difficulties in "medical well-being" domain; she was generally healthy but insomnia affected quality of life). The ALJ should have considered CWW's sleep disorder at Stage two and determined whether that impairment, alone or in combination with others, caused CWW to medically or functionally equal a listed impairment.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Plaintiff's Motion for Summary Judgment and **REVERSES** the ALJ's decision; the Court **DENIES** Defendant's Cross-Motion for Summary Judgment. Typically, when a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). "Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (reversing and remanding for the consideration of new evidence instead of awarding benefits). The Court concludes this case should be **REMANDED** for further administrative proceedings in accordance with this Order.

**IT IS SO ORDERED.**

Dated: November 21, 2016

_____
MARIA-ELENA JAMES
United States Magistrate Judge

16